IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

_____

No. 16-0410

_____

**FILED**

**June 7, 2017**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: REMAINS OF CHESTER HOWARD WEST

_____

Appeal from the Circuit Court of Mason County
The Honorable David W. Nibert, Judge
Civil Action No. 15-P-18

AFFIRMED

_____

Submitted: February 15, 2017
Filed: June 6, 2017

Robert M. Bastress, Jr.                     John R. Teare, Jr.
Morgantown, West Virginia                   Spilman, Thomas & Battle, PLLC
Counsel for the Petitioner                  Charleston, West Virginia
                                            Counsel for the Respondent

JUSTICE WALKER delivered the Opinion of the Court.

CHIEF JUSTICE LOUGHRY dissents and reserves the right to file a dissenting opinion.

JUSTICE WORKMAN dissents and reserves the right to file a dissenting opinion.

i

SYLLABUS BY THE COURT

1.      "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" Syllabus Point 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996).

2.      In cases of disinterment of human remains, an abuse of discretion standard governs our review of the circuit court's final order and ultimate disposition in the exercise of its powers in equity.

3.      "West Virginia Code § 29–1–8a (1993) preempts common law with respect to the matters specifically addressed in the statute. The statute preempts all common law claims involving 'historic or prehistoric ruins, burial grounds, archaeological site, or human skeletal remains, unmarked grave, grave artifact or grave marker of historical significance.' W. Va. Code § 29-1-8a(c)(1)."  Syllabus Point 2, *Hairston v. General Pipeline Construction, Inc.*, 226 W.Va. 663, 704 S.E.2d 663 (2010).

WALKER, Justice:

This appeal arises from a petition filed in the Circuit Court of Mason County seeking authorization to disinter the remains of Chester Howard West, a World War I Medal of Honor recipient, and bury him with full military honors at the Gold Star Family Memorial Monument located within the Donel C. Kinnard Memorial State Veterans Cemetery in Institute, West Virginia ("Veterans Cemetery"). Hershel Woodrow Williams, a Medal of Honor recipient, filed the petition for Mr. West to be recognized as a recipient of the highest award a citizen can receive for bravery and valor. In an order dated March 23, 2016, the Circuit Court of Mason County granted Mr. Williams's petition.

Petitioner Roger VanSickle urges this Court to reverse the order below on the grounds that the circuit court lacks the authority to rule on the question of disinterment of Mr. West's remains. Alternatively, Mr. VanSickle argues that the circuit court abused its discretion in concluding that the equities favor disinterment over the wishes of the surviving spouse at the time of Mr. West's death and the living VanSickle family relatives.

Mr. Williams argues that the circuit court properly exercised its equitable jurisdiction and carefully balanced the equities in favor of disinterment of Mr. West's remains. He contends that Mr. West's remains should be moved to the Veterans

1

Cemetery so that he is honored for his heroic service and his grave is properly maintained.

Upon consideration of the parties' briefs and arguments, the submitted record and pertinent authorities, we affirm the March 23, 2016 order of the Circuit Court of Mason County.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. West received the Medal of Honor for his heroic service in World War I. According to facts in the hearing record below and undisputed by the parties, he was a 20-year-old first sergeant in an automatic rifle section of the 363rd Infantry Regiment, United States Army's 91st "Wild West" Division. On September 26, 1918, the opening day of the Allies' Meuse-Argonne Offensive, Mr. West approached German lines near Bois-de-Cheppy, France. Mr. West's Medal of Honor citation stated:

> While making his way through a thick fog, his advance was halted by direct and unusual machine gun fire from two guns. Without aid, he at once dashed through the fire and, attacking the nest, killed two of the gunners, one of whom was an officer. This prompt and decisive hand-to-hand encounter on his part enabled his company to advance farther without the loss of a man.

After the war, Mr. West settled in Mason County, West Virginia and married Maggie Elizabeth VanSickle ("Maggie VanSickle") in 1932. On May 20, 1935, Sam

2

McClausland fatally shot Mr. West while Mr. West was working on the McClausland farm in Mason County.

Maggie VanSickle had her husband buried in the VanSickle family cemetery, which is located now within the property encompassing the Chief Cornstalk Wildlife Management Area ("Cornstalk WMA") owned by the State of West Virginia. Once acquired by the State, the road leading to the VanSickle family cemetery was gated. With the passage of time, the road merged with the surrounding forest.

In 2015, a Boy Scout learned of Mr. West's Medal of Honor status and burial in Mason County and sought to locate the VanSickle family cemetery as an Eagle Scout project. The Boy Scout, with the help of family members and other scouts, located the cemetery and cleared it. The work included removal of a large oak tree that had fallen and damaged two of the headstones, including Mr. West's headstone.

Mr. Williams filed his petition on September 14, 2015, seeking authority under West Virginia Code §§ 37-13-1 through 7 (2015) to move Mr. West's remains from the VanSickle family cemetery to the Veterans Cemetery. According to Mr. Williams, his research through the Medal of Honor Foundation ("the Foundation") revealed no next of kin of Mr. West. He also represented that he confirmed that the remains of Mr. West were located in the VanSickle family cemetery, which had been overgrown and only discovered when recently cleared.

3

In Mr. VanSickle's answer to the Mr. Williams's petition, he noted that family members could have been identified by tax records, land records and phone records. He strenuously objected to moving Mr. West's remains from the VanSickle family cemetery, explaining that even though her husband was a distinguished Medal of Honor recipient, Maggie VanSickle chose to bury him in the family cemetery. Mr. VanSickle also represented that plans had been under way to clear the cemetery when the Boy Scout requested permission to do so as his Eagle Scout project.

The Circuit Court of Mason County conducted its hearing on February 29, 2016, and heard the testimony of five witnesses. Mr. Williams testified that he learned of a Medal of Honor recipient buried somewhere in Mason County from Keith Gwinn, the Secretary of the Department of Veterans Assistance[1] in approximately 2012. Several years later, he arranged through a friend to meet with another couple and walk into Cornstalk WMA to the cemetery. Mr. Williams testified it was quite a distance. He further testified that although Mr. West's headstone was broken into two pieces and was so worn by the weather it was difficult to make out, he was able to see part of the name and the unit within which Mr. West served.

---

[1] In his testimony, Mr. Williams referred to Keith Gwinn as the Director of the Department of Veterans Affairs. In 2011, the Legislature eliminated the former Division of Veterans Affairs and created an agency entitled the Department of Veterans Assistance. Its administrative head is the cabinet secretary.

4

Mr. Williams also described that he had arranged for a funeral home to remove Mr. West's remains for reinterment in a new resting place. He testified that the Huntington Police Department would provide an escort and that the Veterans Cemetery would provide Mr. West with a gravesite and full military honors. All of these services would be provided at no cost, according to Mr. Williams.

When asked why he wanted to reinter Mr. West's remains, Mr. Williams testified as follows:

> Well, since he is a [M]edal of [H]onor recipient, having received the highest award that our country can give for bravery and valor, we feel that he is entitled to be in a location where people can recognize the service that he did for our country, and that he has earned the right to have a place where others can realize and recognize the fact that he is a hero. So I feel that the [Donel] C. Kinnard [C]emetery, our only West Virginia state veterans cemetery, would be a proper place[,] and they would certainly give all of the care, year-round care, to care for his gravesite.

Robert Sullivan, a police officer assisting the Foundation with information relating to the disinterment of Mr. West's remains, also testified at the hearing regarding the condition of the VanSickle family cemetery. Describing a 2015 trip with Mr. Williams, Mr. Sullivan testified that he only had GPS coordinates to find the cemetery. The road shown on the tax map was not actually there, so they were forced to walk. Mr. Sullivan further testified that the road to the cemetery had not been maintained since the State acquired the land. While walking in, they then came upon a man who told Mr. Sullivan that it had been twenty to thirty years since anyone had actually maintained the

road. Mr. Sullivan testified that grass now covered the road. He commented that he never knew the road existed even though he has hunted in Cornstalk WMA for years. Mr. Sullivan stated that he and Mr. Williams walked on a worn path. He further described that the cemetery itself looked "reasonable" when they saw it in 2015 because Boy Scouts had cleaned it up for a project. Nonetheless, Mr. Sullivan noted it was "just so isolated in the middle of nowhere."

Mr. VanSickle testified that Maggie VanSickle remarried and moved to Charleston where she died in 1950. He represented that Mr. West was his great uncle by marriage and that all the other witnesses opposing removal of Mr. West's remains have the same degree of relation as he has to Mr. West. Mr. VanSickle testified that to his knowledge Mr. West had no children or siblings. Mr. VanSickle agreed that the cemetery is a 50-by-65 foot private family cemetery located on State land. He also confirmed that several VanSickle family members are buried in that cemetery. Mr. VanSickle further stated that Maggie VanSickle decided to bury Mr. West at the family cemetery and for that reason, he felt Mr. West should remain there.

Doug Hudson testified that in 2003, the VanSickle family cemetery was in "bad shape." Mr. Hudson explained that the reason the cemetery was in that condition was because it was isolated and nobody could get there. He testified that he attempted to obtain a permit to bring equipment in to clean off the cemetery but was told by Cornstalk WMA officials that he had to walk in and carry his own equipment. He testified he

6

cleaned it off several summers himself but could no longer do it. He further represented that he had some people to help him but could not get a permit. Mr. Hudson did not identify his relationship to Mr. West.

Carolyn Bailey testified that her mother was Maggie VanSickle's niece. Ms. Bailey testified that she firmly believed Maggie VanSickle would have wanted to be buried beside Mr. West. For this reason, Ms. Bailey testified she felt Mr. West's remains should stay in the VanSickle family cemetery. Ms. Bailey speculated that weather conditions in the winter of 1950 prevented Maggie VanSickle from being brought to Mason County for burial. Because more than eighty years had passed and the relatives do not believe that the wishes of Maggie VanSickle should be disregarded, Ms. Bailey suggested that a reasonable alternative would be to build a memorial in Mr. West's honor at the Veterans Cemetery.

On March 23, 2016, the circuit court granted Mr. Williams permission to enter "upon the lands of the State of West Virginia and into the VanSickle cemetery to carefully remove the remains of Chester Howard West therefrom, together with the headstone there situate and to re-inter such remains at the [Donel] C. Kinnard Cemetery at Institute, West Virginia." Mr. VanSickle appeals the circuit court's order.

7

## II.  STANDARD OF REVIEW

We have long held that "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*." Syl. Pt. 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996). We likewise find that in cases regarding disinterment of human remains, an abuse of discretion standard governs our review of the circuit court's final order and ultimate disposition in the exercise of its inherent powers in equity. *See State v. Highland*, 71 W.Va. 87, 92, 76 S.E. 140, 142 (1912) (no abuse of discretion when circuit court refused to allow disinterment of remains for evidentiary purposes in a murder trial).

## III.  DISCUSSION

In his petition below, Mr. Williams requested authority to disinter and transfer Mr. West's remains under the provisions of West Virginia Code §§ 37-13-1 through -7 (2011), which establishes a process by which a party may seek authorization from the circuit court to remove human remains from a gravesite  located on private land. However, based on the facts adduced during the hearing, the circuit court concluded that the provisions of West Virginia Code §§ 37-13-1 through -7 did not apply to this

proceeding because Mr. West's remains were not located on private land.[2] The circuit court thus proceeded to act in equity, explaining:

> Because there appears to be no specific statutory enactment which would address the factual circumstances herein, this Court may act in equity, with the inherent power to provide equitable relief to the Petitioner if the relief also is equitable to honor the memory of Chester Howard West.

After considering the facts and balancing the equities, the circuit court ordered that Mr. Williams may enter Cornstalk WMA and the VanSickle family cemetery "to carefully remove the remains of Chester Howard West" and lay them to rest at the Veterans Cemetery.

On appeal, Mr. VanSickle argues for the first time that there is a statutory prohibition against the circuit court's exercise of its equitable jurisdiction. In reliance upon *Hairston v. General Pipeline Construction, Inc.*, 226 W.Va. 663, 704 S.E.2d 663 (2010) (*Hairston I*), Mr. VanSickle asserts that West Virginia Code § 29-1-8a (2013) preempted the circuit court's common law jurisdiction to decide the issue of whether the remains of Mr. West should be disinterred and buried in another location.

---

[2] West Virginia Code §37-13-1 provides in relevant part that "[t]he circuit court of any county shall have jurisdiction and authority to permit and order the removal, transfer and re-interment, or other disposition, of remains in any graves located upon privately owned land within the boundaries of such county . . . ." W.Va. Code § 37-13-1.

In response, Mr. Williams argues that while the Legislature enacted West Virginia Code § 29-1-8a to prohibit disturbance of certain graves, it remains within the jurisdiction of the circuit court to rule in equity regarding the disinterment of Mr. West's remains. Moreover, Mr. Williams states that he is prepared through a qualified funeral director to obtain any permits that may be required.

West Virginia recognizes a common law right to petition the circuit court to resolve disputes involving the disinterment of human remains. In *Sherrard v. Henry*, 88 W.Va. 315, 106 S.E. 705 (1921), this Court reversed a circuit court's injunction preventing the disinterment of remains buried in another's claimed burial plot and found that the equities favored the party seeking disinterment. *Id.* at 322, 106 S.E. at 708. Resolving the issue of the power of the court to act in equity, we noted that it is well established that "a court of equity will interfere to prevent desecration of places of burial of the dead or to prevent the removal of bodies properly buried . . . ." *Id.* at 319, 106 S.E. at 707. We further explained:

> There is no property in a dead body, and, this being true, the law can afford no remedy in a case where the removal of such a body is sought or attempted. The courts do, however, recognize that, while there is no property in the body, the close relatives have a right to protect the same, and to prevent its removal or the desecration of the grave. This being true, there is no other remedy except resort to a court of equity when the removal of a dead body is attempted or threatened, and then such relief is granted as the circumstances require, and as is in consonance with the feelings of mankind.

10

*Id.* at 319-320, 106 S.E. at 707 (internal citations omitted). *See also, Highland,* 71 W.Va. at 89-90, 76 S.E. at 141 (request to disinter victim's remains for autopsy denied because relatives of deceased have quasi property right which the courts will protect); Syl. Pt. 1, *England & Bishop v. Central Pocahontas Coal Co.*, 86 W.Va. 575, 104 S.E. 46 (1920) (right to bury corpse and preserve remains is a quasi property right that may be redressed in courts in action for unlawful disinterment and desecration of gravesites).

Accordingly, the Circuit Court of Mason County had the authority under common law to rule on Mr. Williams's petition in equity. We next consider whether West Virginia Code § 29-1-8a preempted the circuit court's common law jurisdiction to decide the issue of whether the remains of Mr. West should be disinterred and buried in another location.

In *Hairston I*, we considered a certified question whether West Virginia Code § 29-1-8a preempted a common law cause of action for direct or indirect desecration of graves. We observed that "the statute discloses a clear legislative intent to preempt common law desecration claims with respect to the narrowly-defined matters identified and covered by the statutory protection." *Hairston I,* 226 W.Va. at 670, 704 S.E.2d at 670. Accordingly, we held:

> West Virginia Code § 29-1-8a (1993) preempts common law with respect to the matters specifically addressed in the statute. The statute preempts all common law

11

claims involving "historic or prehistoric ruins, burial grounds, archaeological site, or human skeletal remains, unmarked grave, grave artifact or grave marker of historical significance." W. Va. Code § 29-1-8a(c)(1).

*Id.* at 665, 704 S.E.2d at 665, syl. pt. 2. However, we specifically noted that "[t]he preemptive effect of the statute applies *only* to the narrowly-defined categories of graves and other related items that the statute delineates." *Id.* at 670, 704 S.E.2d at 670 (emphasis added). We further explained that "common law is not preempted by the statute where the legislature has not specified statutory protection in West Virginia Code § 29-1-8a." *Id.*

We considered West Virginia Code § 29-1-8a again in *General Pipeline Construction, Inc. v. Hairston*, 234 W.Va. 274, 765 S.E.2d 163 (2014) (*Hairston II*). The salient issue in *Hairston II* was whether West Virginia Code § 29-1-8a gave rise to a private cause of action for negligence. In holding that it does not, we relied in part upon the clear legislature purpose of West Virginia Code § 29-1-8a:

> The stated legislative purpose of W.Va. Code § 29-1-8a(a) is to defend "the safety and sanctity of unmarked graves," so as to allow the "appropriate pursuit" of "worthy scientific and educational activities" by "those persons engaged in the scientific study or recovery of artifacts[.]" In other words, the statute is intended to protect the rights of people engaged in the scientific study of ancient, historic graves.

12

*Hairston II*, 234 W.Va. at 282-83, 765 S.E.2d at 171-72. We further concluded that the Legislature did not intend to infer the creation of a private cause of action. *Id.* at 283, 765 S.E.2d at 172.

Thus, in order to determine whether West Virginia Code § 29-1-8a preempted the circuit court's common law jurisdiction in the case before us, we examine whether Mr. Williams's claim falls within "the narrowly-defined matters identified and covered by the statutory protection." *Hairston I*, 226 W.Va. at 670, 704 S.E.2d at 670. As we referenced in *Hairston II*, no conjecture or inference is necessary to ascertain the legislative purpose and scope of West Virginia Code § 29-1-8a. The statute plainly states:

> The Legislature finds that there is a real and growing threat to the safety and sanctity of unmarked human graves in West Virginia and the existing laws of the state do not provide equal or adequate protection for all such graves. As evident by the numerous incidents in West Virginia which have resulted in the desecration of human remains and vandalism to grave markers, there is an immediate need to protect the graves of earlier West Virginians from such desecration. Therefore, the purpose of this article is to assure that all human burials be accorded equal treatment and respect for human dignity without reference to ethnic origins, cultural backgrounds, or religious affiliations.

> The Legislature also finds that those persons engaged in the scientific study or recovery of artifacts which have been acquired in accordance with the law are engaged in legitimate and worthy scientific and educational activities. Therefore, this legislation is intended to permit the appropriate pursuit of those lawful activities.

13

> Finally, this legislation is not intended to interfere with the normal activities of private property owners, farmers, or those engaged in the development, mining or improvement of real property.

W. Va. Code § 29-1-8a(a). Clearly, the matter of whether the remains of a Medal of Honor recipient should be disinterred and moved to the Veterans Cemetery does not fall within the legislative purpose plainly stated in West Virginia Code § 29-1-8a. Mr. West's grave is not unmarked, has not been vandalized, and is not the subject of any scientific or educational study of artifacts.

We next consider whether Mr. West's grave is subject to the protection of West Virginia Code § 29-1-8a. Mr. VanSickle contends that Mr. West's headstone marking the location of his remains meets the statutory definition of "grave marker," which is defined as "any tomb, monument, stone, ornament, mound, or other item of human manufacture that is associated with a grave[.]" W.Va. Code §29-1-8a(b)(4). Thus, he argues, the statute's directive that no person may "remove, destroy or otherwise disturb . . . any grave marker of historical significance" applies. W.Va. Code §29-1-8a(c)(1). Mr. VanSickle asserts that Mr. West's grave marker is "of historical significance" because he was a World War I Medal of Honor recipient. Accordingly, Mr.

VanSickle asserts that Mr. Williams's claim is preempted by West Virginia Code § 29-1-8a.[3]

While Mr. West's grave marker may meet the statutory definition of "grave marker," the question we consider is whether it is "of historical significance" as that phrase is used in West Virginia Code § 29-1-8a(c)(1). The statute offers no definition of "historical significance" and Mr. VanSickle provides no analysis of the statutory meaning. However, we find that "historical significance" must be considered in the context of the clearly articulated purposes of the statute.

As discussed above, the Legislature articulated two purposes for West Virginia Code § 29-1-8a. The first purpose is to protect desecrated and vandalized graves left unmarked due to previous lack of respect for the sanctity of human remains. Second, the statute recognizes and permits the scientific study or recovery of artifacts. We consider the meaning of the term "historical significance" with those clear purposes in mind and find that Mr. West's grave marker is not protected by West Virginia Code § 29-1-8a. While Mr. West's service in World War I and his Medal of Honor are unquestionably significant in history, his grave marker does not fall within "the narrowly-defined matters identified and covered by the statutory protection" of West Virginia Code

---

[3] We note that Mr. VanSickle did not present this argument below of in his brief. Rather, counsel argued the preemptive effect of West Virginia Code § 29-1-8a solely during oral argument.

§ 29-1-8a.  *Hairston I*, 226 W.Va. at 670, 704 S.E.2d at 670.  Accordingly, the claims of Mr. Williams are not preempted by West Virginia Code § 29-1-8a.

Finally, we consider Mr. VanSickle's argument that the circuit court abused its discretion in weighing the equities and granting Mr. Williams's petition.  Mr. VanSickle asserts that the overriding factor controlling the decision to disinter the remains within a gravesite should be the wishes of the family.  To the contrary, our prior case law establishes that while the family's quasi property right includes the possession and custody of the body for burial or other disposition, the custody of the remains after burial is in the law and must be resolved in the courts.  *See Sherrard*, 88 W.Va. at 319-20, 106 S.E. at 707.

The Supreme Court of New Hampshire succinctly addressed the difficult subject of what courts should consider in disinterment cases as follows:

> The rights of relatives and friends respecting the care and control of the remains of their dead can be best determined and administered by the rule of reasonableness. The fact that jurisdiction over these matters is given to courts of equity is a persuasive reason why a liberal procedure in determining the rights of the parties should be adopted. There is nothing that touches more intimately the feelings and sensibilities of people than controversies relating to the disposal and control of the remains of their dead. And such methods should be adopted in dealing with these unfortunate disputes as are best calculated to reach just and equitable results, and to inflict the least trouble and distress upon the parties.

> The court in the trial of such an action, having found the facts, should be guided in making his decree by what is "fit and proper" to be done, taking into consideration all the special

16

circumstances surrounding that particular case; due regard being given to the wishes of the decedent, the rights of relatives and friends, and the welfare of the public.

*Lavigne v. Wilkinson*, 80 N.H. 221, 223 116 A. 32, 33 (1921). More recently, courts have accumulated a number of factors to be considered given the particular circumstances of a case:

> There is no rigid rule for either permitting or refusing removal of a body once interred, and each case must be determined on its own merits. Thus, whether reasonable cause for reinterment has been shown will depend upon the respective weight, or persuasiveness, of a variety of factors. Among the factors that are to be given due regard in reinterment decisions are:
>
> - the interests of the public
> - the wishes of the decedent
> - the rights and feelings of those entitled to be heard by reason of relationship or association with the decedent
> - the degree of relationship to the decedent of those opposing or seeking disinterment
> - the conduct of the parties seeking and opposing reinterment, especially as it relates to the circumstances of the original interment
> - the integrity and capacity of the person seeking reinterment to provide a secure and comparable resting place for the decedent
> - any agreement with, or regulations of, the persons or associations maintaining the cemetery in which the decedent is buried
> - whether consent was given, by persons with authority to do so, to the burial in the first place of interment

22A Am. Jur. 2d Dead Bodies §65 (2013). *See also*, *Maffei v. Woodlawn Memorial Park*, 130 Cal. App. 4th 119, 124-125, 29 Cal. Rptr. 3d 679, 683 (2005).

In a case involving facts similar to those before us, the Supreme Court of Appeals of Virginia found that a circuit court, exercising its power in equity, did not commit error in denying an injunction sought by family members opposed to disinterment of relatives. *Grinnan v. Fredericksburg Lodge No. 4 A.F. & A.M.,* 88 S.E. 79, 80 (Va. 1916). The family members objected to the reburial of the remains of their loved ones in another site within the same Masonic Cemetery in order to make room for a memorial to George Washington, who became a Mason at that lodge. *Id.* at 79-80. Relying in part upon the fact that "the condition of this cemetery for the past 50 years has been melancholy indeed," the *Grinnan* court affirmed the lower court's consideration of the equities, including the interests of Masons as well as the general public, over the interests of the few objecting family members. *Id.* at 81. The *Grinnan* court further noted that the dignity of the buried and their descendants would be honored in the disinterment and reburial process and that "the removal proposed in this case would, instead of desecrating the sepulcher of complainants' dead, rather tend to preserve and beautify their resting place." *Id.* at 80-81.

In the case before us, Mr. VanSickle argues that the equities favor reversing the circuit court's decision below because: (1) Maggie VanSickle's wishes were that her husband be buried in the VanSickle family cemetery; (2) the only surviving relatives of the couple strongly oppose disinterment of Mr. West's remains; (3) no evidence has been presented of other, closer next-of-kin, whose wishes differ from the surviving relatives; (4) the VanSickle family has been repeatedly denied access to Mr. West's gravesite to

18

maintain it; and (5) other suitable alternatives exist to honor Mr. West without causing emotional injury to Mr. West's family.

Undeniably, the record contains no evidence of living blood relatives of Mr. West. While Mr. VanSickle filed an objection to Mr. Williams's petition to disinter Mr. West's remains and others testified at the hearing, all of those objecting to the removal have no direct, familial connection to Mr. West. Mr. West's surviving spouse remarried and died over sixty-five years ago, leaving no documented sentiment as to her own burial with her first husband. The VanSickle family cemetery is now overgrown and neglected in a remote section of a public wildlife management area owned by the State. To date, no one on Mr. West's behalf has asserted any right to enter into the Cornstalk WMA to provide upkeep to the cemetery and particularly the gravesite of this Medal of Honor recipient.

On the other hand, upon discovery of Mr. West's remains, Mr. Williams has expended time and energy to arrange for persons qualified to undertake Mr. West's disinterment with dignity and care, transport his remains with honor, reinter them with full military honors, and provide perpetual care for his gravesite. We understand that the VanSickle family has been denied the opportunity to enter Cornstalk WMA with the necessary equipment to keep the cemetery in the condition deserving of their loved ones. The fact remains that the cemetery where he is buried is in a location where perpetual care is highly unlikely. Mr. Williams has demonstrated the integrity and capacity to

provide a most suitable and deserving resting place for Mr. West's remains. Accordingly, we hold that the Circuit Court of Mason County did not abuse its discretion in concluding that the equities favored the disinterment of the remains of Mr. West and granting the petition of Mr. Williams.

## IV. CONCLUSION

For the foregoing reasons, we affirm the March 23, 2016 order of the Circuit Court of Mason County.

Affirmed.